Argued and submitted March 1, affirmed July 26, 1988

FORELAWS ON BOARD et al,
*Petitioners,*

*v.*

ENERGY FACILITY SITING COUNCIL,
*Respondent.*

(SC S33953 (Control))

MARBET,
*Petitioner,*

*v.*

ENERGY FACILITY SITING COUNCIL,
*Respondent.*

(SC S33954)
(Cases Consolidated)

760 P2d 212

Daniel W. Meek, Portland, argued the cause and filed briefs for petitioners Forelaws on Board and John Arum.

Lloyd K. Marbet, Portland, petitioner *pro se.*

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Richard Williams, Portland, argued the cause for Intervenor *Teledyne Wah Chang Albany.* With him on the briefs were Bert K. Fukumoto and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

LENT, J.

**LENT, J.**

At issue is whether the Energy Facility Siting Council (EFSC) lawfully determined that certain industrial waste of intervenor Teledyne Wah Chang Albany (TWCA) was not "radioactive waste," as that term is defined by ORS 469.300(17). Petitioners contend that EFSC misinterpreted ORS 469.300(17), committed procedural errors and based its decision on insufficient evidence. We affirm EFSC's order.

I.

The disposal of radioactive waste in Oregon requires a site certificate from EFSC.[1] *See* ORS 469.320(1) and ORS 469.300(10)(b), (14), (17)(a) and (24). "Radioactive waste" is defined by ORS 469.300(17)(a):

> " 'Radioactive waste' means all material which is discarded, unwanted or has no present lawful economic use, and contains mined or refined naturally occurring isotopes, accelerator produced isotopes and by-product material, source material or special nuclear material as those terms are defined in ORS 453.605. The term does not include those radioactive materials identified in OAR 345-50-020, 345-50-025 and 345-50-035, adopted by the council [EFSC] on December 12, 1978, and revised periodically for the purpose of adding additional isotopes which are not referred to in OAR 345-50 as presenting no significant danger to the public health and safety."

TWCA maintains that no site certificate is required for the disposal of its waste because the waste, though radioactive, consists of materials identified in OAR 345-50-035 as presenting no significant danger to public health and safety. OAR 345-50-035, known as the "pathway exemption," provides, in part:

> "Naturally occurring radioactive materials shall be exempt [from EFSC regulation] if it can be demonstrated that

---

[1] Notwithstanding the statutory provision for a site certificate, ORS 469.525 bans, with three exceptions, the disposal of radioactive waste. There is nothing in the record to make it appear that TWCA's wastes are not within the exception stated in ORS 469.525(1) for "[w]astes generated before June 1, 1981, through industrial or manufacturing processes which contain only naturally occurring radioactive isotopes which are disposed of at sites approved by the council [EFSC] in accordance with ORS 469.375."

accumulation of material will not result in exposures exceeding 500 millirem[2] of external gamma radiation per year, nor in the release of effluents to air and water in annual average concentrations exceeding the values in Table 3."

TWCA refines zirconium metal from sand containing the mineral zircon. Zircon sand contains a number of naturally occurring radioactive isotopes, which remain in the waste generated by the refining process. Since 1979, TWCA has disposed of zirconium refining waste at a site outside Oregon, but prior to that time the waste was placed in sludge ponds at TWCA's plant site just north of Albany, Oregon. This proceeding involves waste located in two sludge ponds known as Lower River Pond (LRP) and Schmidt Lake (SL), which are near the confluence of Truax Creek and the Willamette River. Among the radioactive isotopes found in LRP and SL, radium-226 is of chief concern. Upon radioactive decay, radium-226 becomes radon-222, a radioactive gas. This gas may become concentrated in buildings and be breathed into the lungs, where it poses a significant health risk.

Although TWCA maintains that the waste in LRP and SL is below the radioactivity thresholds set by OAR 345-50-035, and thereby exempt from EFSC regulation, TWCA filed an application for a site certificate from EFSC in order to obtain an adjudication of the question. Other parties, including petitioners, intervened in the application proceeding. Following hearings, EFSC determined that LRP and SL were below the gamma radiation and water effluent thresholds of OAR 345-50-035 but would "likely" exceed the threshold for the concentration of radon-222 in the air above the waste. This conclusion was based on findings that the radon-222 concentrations would range from a level below the threshold to a level above the threshold. EFSC held that the waste in LRP and SL was "radioactive" and issued TWCA a site certificate, which set a number of conditions on the continued storage of the waste.

---

[2] A "millirem" is one-thousandth of a rem. "Rem" is an acronym for "roentgen equivalent man," which is defined as "the dosage of any ionizing radiation that will cause the same amount of biological injury to human tissue as one roentgen of X-ray or gamma-ray dosage." Webster's Third New International Dictionary 1919 (1971). A "roentgen" is "the international unit of X radiation or gamma radiation that is the amount of radiation producing [under specified atmospheric conditions] ionization * * * equal to one electrostatic unit of charge." *Id.* at 1967.

TWCA petitioned for judicial review, and this court reversed and remanded EFSC's order. *Teledyne Wah Chang v. Energy Fac. Siting Council,* 298 Or 240, 692 P2d 86 (1984). The remand was necessary because EFSC found only that the radon-222 concentrations above LRP and SL would be in a range that extended from below the threshold to above the threshold, not that the *annual average* radon-222 concentrations would be above the threshold, as required by OAR 345-50-035. *Id.,* 298 Or at 254.

On remand, EFSC found that the annual average radon-222 concentrations above both LRP and SL were below the threshold set by OAR 345-50-035. On the basis of those findings, it concluded that the waste in LRP and SL was "not within the jurisdiction of [EFSC]" and ordered that "no further proceedings be held regarding LRP and SL." Petitioners, intervenors below, sought judicial review in this court pursuant to ORS 469.400(1).[3]

II.

Before discussing petitioners' arguments regarding EFSC's radon-222 findings, we first discuss their contention that TWCA failed to prove that its waste was below the gamma radiation and water effluent thresholds set by OAR 345-50-035.

■■ TWCA, as the applicant for a site certificate from EFSC, has the burden of proving that its waste is not "radioactive waste," as that term is defined by ORS 469.300(17)(a). *Teledyne Wah Chang v. Energy Fac. Siting Council, supra,* 298 Or at 248-50. TWCA has persuaded EFSC. Whether TWCA's evidence would persuade us is irrelevant. Our review of the evidentiary basis for EFSC's order is limited to whether the order was supported by substantial evidence in the record. *See* ORS 469.400(1) and 183.482(8)(c). "Substantial evidence exists to support a finding of fact when the record, viewed as a

---

[3] Jurisdiction to review EFSC's "approval or rejection" of a site certificate application is conferred upon this court. ORS 469.400(1). We have previously rejected EFSC's contention that review pursuant to ORS 469.400(1) is improper because EFSC neither "approved" nor "rejected" TWCA's site certificate application. EFSC's order was technically a "rejection" of the application, and review pursuant to ORS 469.400(1) is proper. *Forelaws on Board v. Energy Fac. Siting Council,* 303 Or 541, 544, 738 P2d 973 (1987).

whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c); *see also Younger v. City of Portland,* 305 Or 346, 352-57, 752 P2d 262 (1988).[4]

## A. *Gamma Radiation Threshold*

■ In its previous order, EFSC found that gamma radiation exposures from LRP and SL would not exceed 500 millirem per year, the threshold set by OAR 345-50-035. EFSC adhered to that finding in its present order. A reasonable person, viewing the evidence as a whole, could make the same finding.

The record shows that gamma radiation from LRP and SL was measured at 0 to 280 millirem per year (exclusive of background radiation of approximately 90 millirem per year). Petitioners contend that the radiation measuring devices were placed at the "perimeter" of the sludge ponds and that this placement might have caused the measured gamma radiation to understate the true radiation emanating from the surface of the ponds. An expert witness for TWCA testified that the measuring devices were placed above the surfaces of the ponds but only 4 to 5 feet from their shores because their surfaces at the time of placement would not support the weight of the workers who placed the devices. The witness stated that the intensity of gamma radiation decreased rapidly with distance and that essentially all of the gamma radiation received by the measuring devices would be received from sources within a few feet of the devices. Consequently, placing the devices within a few feet of the shores would not underestimate the radiation emanating from the surface of the ponds.

---

[4] Petitioners argue that we should apply what they describe as the "unusually exacting standard of review" applied by this court in its previous decision in this case. *Teledyne Wah Chang v. Energy Fac. Siting Council,* 298 Or 240, 250-56, 692 P2d 86 (1984). The argument is made in the context of review of factual findings for supporting evidence, but the *Teledyne Wah Chang* "standard of review" to which they refer is that found in ORS 183.470(2), which requires an administrative order in a contested case to contain "a concise statement of the underlying facts supporting the findings as to each contested issue of fact and as to each ultimate fact required to support the agency's order." Whether a factual finding, when made, is supported by substantial evidence, as required by ORS 183.482(8)(c), is a different question. Moreover, there was nothing particularly "exacting" about this court's application of ORS 183.470(2). In its 1982 order, EFSC simply failed to support its determination that TWCA's waste exceeded the annual average radon-222 concentration threshold of OAR 345-50-035 with any finding of the annual average radon-222 concentration produced by TWCA's waste. There is no such failure in the order now under review.

There is no evidence to contradict this testimony, and there is nothing in the record from which one could infer that the gamma radiation levels of LRP and SL would be higher at their centers than at their perimeters. More convincing measurements might have been made, but the evidence in the record is sufficient to make EFSC's findings reasonable.

## B. *Water Effluent Threshold*

EFSC found in its previous order that water in LRP and SL contained radium-226 concentrations of up to 13 picocuries per liter.[5] Radium-226 concentrations measured in test wells outside the sludge ponds were lower than those measured from test wells in the ponds. Because there was evidence that water in the sludge ponds represented a "worst case" for radium-226 concentrations in groundwater, EFSC concluded that LRP and SL were below the 30 picocuries per liter effluent threshold for radium-226. On remand, additional testimony was taken on this issue, and EFSC adhered to its earlier findings.

Expert testimony from before and after remand differed on whether the placement of the test wells was adequate. Petitioners speculate that water from unsampled areas of the sludge ponds might have had higher radium-226 concentrations and that better placement of test wells outside the sludge ponds might have yielded measurements of radium-226 concentrations in excess of the threshold, but these speculations are not sufficient to show that EFSC's findings were unreasonable.

## III.

Petitioners principally dispute EFSC's findings regarding radon-222 concentrations above LRP and SL. OAR 345-50-035 sets a radon-222 threshold of 3 picocuries per liter

---

[5] A "picocurie" is one-trillionth of a curie. A "curie" is "a unit quantity of any radioactive nuclide in which exactly $3.7 \times 10^{10}$ disintegrations occur per second." Webster's Third New International Dictionary 556 (1971). A "curie" is also "a unit quantity of radon that in radioactive equilibrium contains one gram of radium." *Id.*

of air or 1/30 (approximately 0.0333) of a "working level."[6] EFSC found that the annual average radon-222 concentration for LRP was 2.2 picocuries per liter and 0.0044 working levels. EFSC found that the annual average radon-222 concentration for SL was 7.5 picocuries per liter and 0.027 working levels. Although the annual average radon-222 concentration for SL exceeded the threshold when expressed in picocuries per liter, the concentration expressed in working levels was just under the threshold. As we discuss in part IV(D), *infra,* picocuries per liter cannot be equated directly with working levels. Because EFSC deemed the working level to be the appropriate measure, it concluded that the waste in SL was below the radon-222 threshold set by OAR 345-50-035.

OAR 345-50-035 sets forth premises under which radiation and effluent measurements are to be made:

"(1) The material shall be considered in the form it exists when it is removed from the users' equipment, systems, or settling ponds prior to any dilution or remedial action designed to reduce radiation levels.

"(2) No consideration shall be given to the ameliorating effects of land use restrictions, maintenance operations, or overburden at the disposal site.

"(3) Accumulations of material over the reasonably projected period of waste generation shall be evaluated.

"(4) External gamma radiation exposures shall be based on actual measurement and allowance may be made for the degree of equilibrium and for self-shielding.

"(5) In computing radon concentrations in the air above a disposal site containing radium-226, the following additional premises shall be used:

"(a) Any house built on ground contaminated with radium-226 is assumed to have an 8-foot high ceiling on the first floor, to have one complete air change per hour, and to have a foundation constructed so as to meet the

---

[6] Footnote 3 to Table 3 of OAR 345-50-035 states:

"These radon concentrations are appropriate for protection from radon-222 combined with its short-lived daughters. Alternatively, this value may be replaced by one-thirtieth (1/30) of a 'working level.' (A *working level* is defined as any combination of short-lived radon-222 daughters, polonium-218, lead-214, bismuth-214, and polonium-214, in one liter of air, without regard to the degree of equilibrium, that will result in the ultimate emission of $1.3 \times 10^5$ MeV of alpha particle energy.)" (Emphasis in original.)

Structural Specialty Code (State of Oregon Uniform Building Code) effective at the time of adoption of these rules. No consideration will be allowed for any special construction or treatments designed to reduce radon diffusion into the structure.

"(b) The relation between radon-emanation rate and radium concentration will be based upon experimental measurements on material intended for disposal."

Thus, the radon-222 concentration to be evaluated by EFSC is that in a house built on the waste rather than that in the open air above the waste. Indoor radon-222 concentrations will ordinarily be higher than outdoor concentrations because the radon-222 gas that enters a building cannot be as easily dispersed by the wind.

During the course of the proceedings before EFSC, a number of issues arose as to the proper application of OAR 345-50-035 to evaluations of radon-222 concentrations. Among these were whether the rule required consideration of "worst case" concentrations of radon-222 or "annual average" concentrations, whether the rule required consideration of all of the waste or only those portions responsible for radon-222 emissions, the proper unit of measurement, the significance of measured concentrations versus calculated concentrations and the nature of the house in which radon-222 concentrations were to be evaluated. EFSC ultimately resolved these issues through "interpretive rulings." Petitioners argue not only that these interpretations were substantively wrong, but also that the issues should have been resolved through prior or contemporaneous rulemaking proceedings under the provisions of the Oregon Administrative Procedure Act (APA), ORS 183.310 to 183.550, citing *Marbet v. Portland Gen. Elect.*, 277 Or 447, 561 P2d 154 (1977). We shall first address whether the issues should have been resolved through rulemaking proceedings and then address the substance of the specific issues decided by EFSC.

■ The APA defines a rule as "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(8). EFSC's interpretations of OAR 345-50-035 are within the APA's definition of "rule," and EFSC could have

made these interpretations in rulemaking proceedings under the APA.[7] But ORS 183.355(5), by authorizing agencies to rely on general policy statements announced in the disposition of contested cases, recognizes that an agency may sometimes, in the course of deciding a contested case, state propositions that it also could adopt in rulemaking proceedings. If an agency is required to adopt a rule through rulemaking proceedings, that requirement must be found through an analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt. *See Trebesch v. Employment Division,* 300 Or 264, 267, 710 P2d 136 (1985).

The statutes governing EFSC explicitly direct it to adopt certain standards in accordance with the procedures set forth in the APA. ORS 469.490; *Marbet v. Portland Gen. Elect., supra,* 277 Or at 458-69. For example, ORS 469.470(3) provides that EFSC "shall * * * [e]stablish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the energy facility to which the site certificate applies and prescribe the form." ORS 469.500(1) directs EFSC to "adopt safety standards promulgated as rules for the operation of all thermal power plants and nuclear installations." ORS 469.510 directs EFSC to "set standards and promulgate rules for the siting, construction and operation of thermal plants and nuclear installations."

■ Apart from their explicit directives to adopt rules, these statutes give EFSC broad authority to set policies for siting and regulating energy facilities. Because the rulemaking proceedings established by the APA, by permitting wider public participation than ordinarily found in the context of a contested case, are particularly appropriate for exercising policymaking authority, the existence of such authority permits a strong inference of legislative intent that the agency exercise its policymaking in rulemaking proceedings rather than in the course of deciding contested cases. This court's conclusion in *Marbet v. Portland Gen. Elect., supra,* that rulemaking proceedings were required was in part predicated on the legislature's broad delegation of policymaking authority to EFSC.

---

[7] Although any administrative proceeding in which a rule is adopted could in some sense be regarded as a "rulemaking proceeding," we use the phrase "rulemaking proceeding" to refer to the procedure for adopting rules set forth in ORS 183.325 to 183.410.

277 Or at 462-63; *see also Megdal v. Board of Dental Examiners,* 288 Or 293, 304-16, 605 P2d 273 (1980).

The required rulemaking with which this court was concerned in *Marbet,* however, related to standards governing site applications. While it is true that this case technically involves an application for a site certificate, and TWCA is technically a site applicant, the issues in this proceeding are not standards for "siting, constructing and operating" an energy facility, but standards for determining whether EFSC may regulate TWCA's waste at all. In this respect, EFSC has promulgated rules to define thresholds of radioactivity that pose hazards to public health, and the Legislative Assembly has adopted these rules, including OAR 345-50-035, in the statutory definition of "radioactive waste." ORS 469.300(17)(a). Moreover, under ORS 469.300(17)(a), EFSC's authority to modify these rules is limited to revisions "for the purpose of adding additional isotopes which are not referred to in OAR 345-50 as presenting no significant danger to the public health and safety." The Legislative Assembly in ORS 469.300(17)(a) has not charged EFSC with broad policymaking authority to define levels of radioactivity subject to regulation — the legislature itself has set the policy — but only with responsibility for applying the statutory definition to specific cases.

■■ We do not, of course, suggest that the statutory definition is so clear that EFSC will not need to interpret the statute in order to apply it, or that EFSC may not interpret the statute by promulgating interpretive rules in the course of rulemaking proceedings. Nor do we suggest that rulemaking proceedings are never required where an agency primarily is interpreting a statute or rule rather than setting policy. *Trebesch v. Employment Division, supra,* is an example of a context in which interpretive rulemaking might be required.[8]

---

[8] The issue in *Trebesch* was whether the Employment Division was required to define by rule the statutory term "systematic and sustained effort to obtain work." The legislature intended the term to be applied uniformly throughout the state, and the assistant director of the division was the official responsible for a uniform application. *Trebesch v. Employment Division,* 300 Or 264, 273, 710 P2d 136 (1985). This court held that if the assistant director was unable to ensure uniform application by reviewing decisions of subordinates in individual cases, the assistant director would be required to promulgate interpretive rules. *Id.,* 300 Or at 274-77. Unlike the assistant director of the Employment Division, EFSC has sole responsibility for agency adjudications. There is no problem of inconsistent interpretation arising from different adjudicators.

There is nothing in the statutes, however, from which we can infer that the legislature intended EFSC to interpret ORS 469.300(17)(a) only through rulemaking proceedings. So long as the parties had an opportunity to present evidence that addressed ORS 469.300(17)(c) as interpreted by EFSC, EFSC did not act unlawfully by interpreting the statute in its order rather than through rulemaking proceedings. Petitioners argue that they were unable to present evidence on the health consequences of EFSC's interpretations, but they do not identify any respect in which they were unable to present evidence on whether TWCA's waste was "radioactive" under those interpretations.

## IV.

We now address petitioners' challenges to the substance of EFSC's interpretations of OAR 345-50-035. Under ORS 183.482(8)(a), we may reverse or remand EFSC's order if it "has erroneously interpreted a provision of law."

In order to determine radon-222 concentrations produced by TWCA's waste, EFSC used a mathematical model of radon-222 movement from soil into a house built over the soil. The model contains a number of variables, the values for which EFSC calculated on the basis of measurements taken from LRP and SL. Petitioners challenge (A) EFSC's use of a mathematical model to predict radon-222 concentrations; (B) EFSC's decisions regarding the nature and extent of the waste to be considered in the model; (C) EFSC's specification of the structure of the house to be used in the model; and (D) EFSC's decision to use "working levels" rather than picocuries per liter to measure radon-222 concentration.

### A. *Use of a Mathematical Model*

■ Petitioners challenge on essentially two grounds EFSC's use of a mathematical model to predict radon-222 concentrations. First, petitioners note that the values used for the model variables were based on averages of measurements of those variables; some measured values greatly exceeded the averages used in the model. Thus, although the model predicts annual average radon-222 concentrations, actual concentrations of radon-222 in some houses built upon the waste may sometimes exceed the threshold value. They argue that EFSC's calculation of annual average concentrations is meaningless because it does not show what percentage of houses

built upon the waste would be expected to have radon-222 concentrations exceeding the threshold set by OAR 345-50-035. Second, petitioners note that measurements of radon-222 concentrations taken from test houses built on the sludge ponds exceeded the radon-222 concentrations predicted by the model. They argue that EFSC cannot rely on model predictions when those predictions are contradicted by actual measurements.

Petitioners' argument that a predicted annual average radon-222 concentration has little significance for determining the threat to public health posed by TWCA's waste may well be valid. This is especially true in this case because the predicted radon-222 concentrations depend upon a large number of variables. EFSC has made no effort to estimate the statistical variation of these variables or the effect that variation has on the significance of its predicted annual averages. But these are criticisms that are properly addressed to the rule and the legislation adopting that rule rather than to EFSC's interpretation of the rule. The rule explicitly refers to "annual average concentration," and the very basis for this court's prior remand to EFSC was EFSC's reliance on an expected range of radon-222 concentrations rather than on an annual average. *Teledyne Wah Chang v. Energy Fac. Siting Council, supra.* Whether an annual average concentration has much meaning for public health is not an issue under the rule; the rule assumes that compliance with the rule protects public health.

Petitioners' argument that EFSC could not ignore measured radon-222 concentrations in the test houses built on the waste in favor of concentrations predicted by the model is more properly characterized as a "sufficiency of the evidence argument" rather than an argument over the proper interpretation of OAR 345-50-035. The rule does not require radon-222 concentrations to be determined only on the basis of concentrations measured in actual test structures.[9] That

---

[9] A portion of the mathematical model made the radon-222 flux from the waste (*i.e.,* the radon-222 emanating from the waste into the air) a function of the radium-226 concentration in the waste and several other variables, including the "emanating power" and moisture content of the waste. The radon-222 flux measured under two of the three test houses built on the waste was greater than that predicted by the model. Petitioners argue that OAR 345-50-035(5)(b) requires EFSC to base its determination of radon-222 concentrations on the measured radon-222 flux rather

concentrations measured in test structures are at variance with predicted concentrations may cast doubt upon the validity of the predictive model or upon the values used for the variables in the model, but the variance alone does not necessarily require a finder of fact to conclude that the model cannot be used in lieu of measurements obtained in the test structures. Indeed, as EFSC stated in its order, a mathematical model may better predict annual average concentrations because a model, not being limited to the unique circumstances and features of a test structure, can incorporate more information.[10]

## B. *The Nature and Extent of the Waste to be Evaluated*

■ In determining the radon-222 concentrations that would be produced by LRP and SL, EFSC considered only the top 30 centimeters of the waste as it existed when EFSC evaluated it. Petitioners argue that the rule requires all of the waste to be considered as of the time that it was placed in LRP and SL. Petitioners contend that by the time the characteristics of the waste were evaluated, several years after the waste was placed in the sludge ponds, the waste had been substantially diluted by the actions of wind and rain.

Because gaseous radon-222 decays relatively rapidly into nongaseous elements, radon-222 produced below a certain depth in waste material will decay before it is able to reach the surface and escape into the atmosphere. EFSC determined that only the top 30 centimeters of LRP and SL emitted radon-222 into the atmosphere. Petitioners do not

---

than the flux predicted by the model. (We assume that the average measured flux under the three houses exceeded the predicted flux, but that is not clear from petitioners' briefs.)

OAR 345-50-035(5)(b) states: "The relation between radon-emanation rate and radium concentration will be based upon experimental measurements on material intended for disposal." EFSC's model satisfies this requirement because the values for the variables in its radon-222 flux model were based upon measurements of TWCA's waste. The rule does not require EFSC to rely upon a *direct* relationship between radium concentration and radon-emanation rate, as petitioners contend. Reliance on a direct relationship would be less precise because radon-222 emanation is not solely a function of the radium-226 content of the waste.

[10] Only one test structure produced radon-222 concentrations in excess of the threshold set by OAR 345-50-035. TWCA and EFSC point out that the waste under that structure was unusually radioactive and unrepresentative of the waste as a whole because that structure was intended to represent a "worst case" for radon-222 concentration.

dispute that only a portion of the waste is currently responsible for emitting radon-222, but they argue that EFSC should have considered the characteristics of all of the waste because future disturbances of the waste — for instance, by construction on the waste or by moving the waste to another site — might bring waste at lower levels to the surface.

If EFSC's order had the effect of determining for all time that TWCA's waste is not "radioactive," we might be persuaded that EFSC had erred in considering only the top portion of the waste. But we do not so interpret EFSC's order. EFSC's evaluation of the waste is necessarily limited to the waste in its current form because many of the variables in the model EFSC used to predict radon-222 concentrations depend upon the peculiar features of LRP and SL, in particular climatic conditions such as average wind speed and average rainfall. Were the wastes located at another site, the radon-222 concentrations predicted by the model might be quite different. This interpretation of EFSC's order is in accord with the purpose to be served by OAR 345-50-035. The rule is intended to exempt from regulation waste that does not emit radiation into the environment in amounts sufficient to pose a threat to public health. *See* OAR 345-50-010(1). EFSC states in its order that if it were to consider the average characteristics of all of the waste, it might be forced to conclude that waste that emitted more than the threshold amount of radon-222 into the atmosphere was nonetheless "not radioactive" if lower levels of the waste produced a sufficiently small amount of radon-222. Given the purpose of the rule, EFSC's consideration of only that portion of the waste that emits radon-222 into the atmosphere is not an erroneous interpretation of the rule. If in the future TWCA's waste is disturbed so that lower, possibly more radioactive waste, is exposed, procedures are available by which EFSC can redetermine the radioactivity of the waste. *See* ORS 469.550 and ORS 469.570.

 Petitioners' argument that the waste should have been evaluated as of the time that it was placed in the sludge ponds relies on OAR 345-50-035(1), which provides:

> "The [waste] material shall be considered in the form it exists when it is removed from the users' equipment, systems, or settling ponds prior to any dilution or remedial action designed to reduce radiation levels."

OAR 345-50-035 applies not only to waste sites that are no longer accumulating waste, such as LRP and SL, but also to sites at which waste will be added in the future. *See* OAR 345-50-035(3). The prohibition on considering "dilution or remedial action designed to reduce radiation levels" is meant to make the evaluation of the radioactivity of the waste independent of remedial efforts that may not be performed in the future. Exposing to the elements waste that is no longer being accumulated is not a remedial measure of this sort because the absence of exposure in the future will not increase the release of radiation to the environment. Indeed, OAR 345-50-035 contemplates that waste will be considered when it is removed from settling ponds, presumably after exposure to the diluting effects of wind and water. We conclude that the rule does not require EFSC to reconstruct radiation levels that no longer exist.

## C. *Characteristics of the House*

 Although OAR 345-50-035 sets forth certain characteristics that a house built upon the waste is assumed to have — "an 8-foot high ceiling on the first floor," "one complete air change per hour" and "a foundation constructed so as to meet the Structural Specialty Code" — the rule does not describe the house in detail. The rule provides generally that "[n]o consideration will be allowed for any special construction or treatments designed to reduce radon diffusion into the structure." EFSC interpreted this general provision to require the use of a "reasonable hypothetical house." In its order, EFSC described the characteristics of a "reasonable hypothetical house" as follows:

> "In determining unspecified characteristics of the hypothetical house and the values used in calculating annual average [radon-222] concentrations, we are guided by the following principles. The hypothetical house should be (1) of a type which one would reasonably expect to be built in the Pacific Northwest; (2) one which would not be overly complex to model; (3) one which would not result in unusually high or low radon concentrations; and (4) one which is built to comply with the applicable Uniform Building Code in all respects. We believe that a house meeting these criteria is most likely to accurately predict the hazard posed by particular wastes."

EFSC also interpreted the rule to require the hypothetical house to have the "most common" type of foundation among

houses now being constructed in the Pacific Northwest. On the basis of evidence in the record, EFSC determined that a 1,250 square foot house with a crawl space foundation was a "reasonable hypothetical house" that could be used to predict radon-222 concentrations.[11]

Petitioners' principal objections to EFSC's characterization of the hypothetical house are that many houses are not built and maintained to code and that approximately half of all houses have basement or concrete slab foundations (also permitted by the building code) rather than crawl space foundations. Petitioners contend that houses not in compliance with the building code or that have basement or concrete slab foundations are more likely to have higher radon-222 concentrations and that EFSC should have taken into consideration these other constructions, perhaps through a weighted-average technique.

While petitioners' suggestions, if adopted by EFSC, might have produced a more realistic, albeit complicated, assessment of the danger presented by TWCA's waste, we cannot say that EFSC's interpretation of the rule is erroneous. The rule requires only that the hypothetical house have certain limited characteristics and that it not be specially designed or treated to reduce radon-222 diffusion into it. In essence, the rule requires a house that is in some sense "reasonable" or "typical." EFSC's necessary elaboration of the characteristics of the house is consistent with the rule.

D. *Use of "Working Levels"*

Finally, petitioners contend that EFSC erred in measuring radon-222 concentrations in terms of "working levels" rather than picocuries per liter.

As we stated in note 5 above, a curie is a measure of the number of radioactive disintegrations per second. To say

---

[11] EFSC did not purport to decide that a 1,250 square foot house was the only size that could be used under the rule. The experts who testified all assumed that the house was of that size, and EFSC found that houses of that size were "common in the Pacific Northwest." We assume that EFSC would permit an applicant for a site certificate to use a house of some other common size. Similarly, if there were sufficient evidence that a crawl space foundation is not the most common type now being built in the Pacific Northwest, we assume that EFSC would not permit radon-222 concentrations to be calculated using a house with a crawl space foundation.

that a radon-222 concentration is a certain number of picocuries per liter is to say that a liter of air contains an amount of radon-222 such that a certain number of radioactive disintegrations per second are occurring from the radon-222 in that liter of air. The health threat posed by radon-222, however, is not primarily from radon-222 itself but from the radioactive by-products, or "daughters," of radon-222 decay. Radon-222 is a gas that is easily breathed in and out of the lungs. The radon daughters are solids that lodge in the lungs, where high-energy alpha particle radiation from the daughters can cause significant damage to the body. A working level is a measure of the alpha particle energy emitted by radon-222 daughters. As such, the working level in a house is considered to be a better measure of the health threat caused by radon-222 than is a measure of the radon-222 concentration itself.

To translate a radon-222 concentration into a working level requires a correction for the degree of "equilibrium" between radon-222 and its daughters. "Radioactive equilibrium" is "the condition in which a radioactive species and its successive radioactive products have attained such relative proportions that they all disintegrate at the same numerical rate and therefore maintain their proportions constant." Webster's Third New International Dictionary 1872 (1971). Only if radon-222 and its daughters are in perfect equilibrium will the OAR 345-50-035 threshold of 3 picocuries per liter of radon-222 equal the threshold of 0.0333 working levels. If, as is ordinarily the case in nature, radon-222 and its daughters are not in equilibrium, the working level of 3 picocuries per liter of radon will be less than 0.0333 working levels.

Petitioners argue that because OAR 345-50-035 states that a radon-222 concentration of 3 picocuries per liter is "appropriate for protection from radon-222 combined with its short-lived daughters," and because it is difficult to calculate the degree of equilibrium between radon-222 and its daughters, EFSC erred in determining the radioactivity of TWCA's waste by using working levels rather than picocuries per liter of radon-222. The rule, however, provides in the next sentence: "Alternatively, this value [3 picocuries per liter] may be replaced by one-thirtieth (1/30) of a 'working level.'" Thus, the rule permits EFSC to use either picocuries per liter or working levels as the appropriate measure. Given the expert testimony from EFSC's consultant that a measurement

expressed in working levels provides a better assessment of health risks than does a measurement expressed in curies — a point that petitioners did not dispute in theory — EFSC did not act improperly by choosing to use working levels to evaluate TWCA's waste. *See* ORS 183.482(8)(b).

### V.

Petitioners challenge the sufficiency of the evidentiary basis for a number of the values chosen by EFSC for the variables in its mathematical model. Petitioners contend that "the evidence in the record supports a different approach or value than the one adopted by EFSC. EFSC's choices were arbitrary, capricious, and contrary to the evidentiary record." But, as we noted in part II, it is not enough to argue on judicial review under ORS 183.482 that the evidence would support a different value than the one adopted by EFSC. Moreover, the conclusory epithets "arbitrary" and "capricious" do not appear in the judicial review provisions of the Oregon APA. *See generally* Brodie & Linde, *State Court Review of Administrative Action: Prescribing the Scope of Review,* 1977 Ariz St LJ 537, 553-56 (1978). Those are terms used in section 10(e) of the federal APA, 5 USC § 706(2)(A), and even there they are not ordinarily considered standards for review of evidentiary sufficiency. *Cf.* 5 USC § 706(2)(E) (requiring agency findings to be supported by "substantial evidence"). Judicial review of the evidentiary sufficiency of findings of fact under the Oregon APA is for "substantial evidence," which is defined to exist when "the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). We shall therefore treat petitioners' evidentiary sufficiency arguments as arguments that a reasonable person, viewing the record as a whole, could not choose the values chosen by EFSC.

The values challenged by petitioners are those for (A) the moisture content of the waste; (B) the outdoor radon-222 concentration at one meter above the waste; (C) the outdoor radon-222 concentration at the height of crawl space vents (0.36 meters); (D) the number of air changes per hour in the crawl space; (E) the percentage of the air entering the living area of the house that entered from the crawl space; and (F) the proper "equilibrium factors" for indoor and outdoor air.

## A. *Moisture Content of the Waste*

■ The moisture content of waste containing radium-226 substantially affects the rate of radon-222 emanation from the waste: the higher the moisture content, the lower the rate of emanation. EFSC found that the "long-term" moisture content of SL was 55 percent and that that of LRP was 63 percent. These figures were based upon laboratory analyses of water retention characteristics of the waste and certain predictions concerning the water table depth and moisture losses from the surface of the waste. EFSC's consultant accepted the validity of this method of predicting moisture content.

Petitioners argue that the moisture content percentages should have been 48 percent for SL and 55 percent for LRP. These figures were derived from a small number of direct measurements of the moisture content of the waste made during the dry part of the year. These measurements are clearly unrepresentative of annual averages. EFSC's findings regarding moisture content are not unreasonable in light of the record before it.

## B. *Radon-222 Concentration at One Meter*

■ Using measurements made between March 1985 and March 1986, EFSC found that the annual average radon-222 concentration at a height of one meter above SL was 5.92 picocuries per liter and that the concentration at one meter above LRP was 1.72 picocuries per liter. Before EFSC, petitioners argued that the respective figures should have been 7.53 and 2.28, using measurements made between August 1985 and August 1986. In their brief before this court, petitioners argue that EFSC should have used a weighted average of all of the measurements made between March 1985 and August 1986, which they contend would yield an annual average figure of 6.76 for SL and 2.02 for LRP. EFSC, in its order, rejected petitioners' suggested use of August 1985 to August 1986 measurements because measurements made between March 1986 and August 1986 were "based on fewer samples and are therefore not as accurate." EFSC did not address the suggestion made by petitioners in their brief to this court. While we might agree with petitioners that, as a general matter, it would have been preferable to use all of the data, we are in no position to second-guess EFSC as to the accuracy of the

unused data. The rejection of these data is not sufficient to make EFSC's findings unreasonable.

## C. Radon-222 Concentration at Vent Height

■■■ No measurements were made of the radon-222 concentration in outdoor air at a height of 0.36 meters, the height at which air entered the crawl space of the hypothetical house. All parties agreed that radon-222 concentration decreases with height, but the parties could not agree upon the precise relationship between height and concentration. EFSC, on the basis of published studies of radon-222 concentration variations at heights below one meter, determined that the annual average radon-222 concentration at 0.36 meters was 8.05 picocuries per liter for SL and 2.34 picocuries per liter for LRP. TWCA, using a theoretical model of air movement, argued for lower values — 6.0 and 1.6, respectively. Petitioners, extrapolating measured variations in radon-222 concentrations at heights above one meter to heights below one meter, argued for higher values — 10.1 and 3.03, respectively. There was evidence, however, that variations in radon-222 concentration at heights above one meter could not be extrapolated to calculate variations at lower heights. EFSC's findings in this respect were not unreasonable.

## D. Air Changes in the Crawl Space

■■■ The radon-222 concentration of the crawl space, which is an important determinant of the radon-222 concentration in the living area of the house, is inversely related to the number of air changes per hour (ACH) in the crawl space. Crawl space ACH is a function of many factors, including crawl space volume, crawl space vent area, wind speed and the temperature difference between the crawl space and the ambient air.

Using ACH measurements made in the crawl space of a test house constructed on LRP, which were correlated with wind speed to provide extrapolated annual data, TWCA's expert witnesses estimated an annual average crawl space ACH of 7.0. Measurements of ACH in the crawl spaces of four real houses in the Albany vicinity yielded values of 4.8, 5.6, 12.0 and 21.4 ACH. EFSC's consultant criticized the test house measurements because the test house crawl spaces were

substantially smaller than those of normal houses and therefore would be expected to have higher ACH values. When the undersized crawl space vent area of the test house was taken into consideration as well, however, TWCA's experts, using EFSC's consultant's method for scaling test house measurements to houses of normal size, calculated that the hypothetical 1,250 square-foot house would still have a crawl space ACH of 7.0.

Petitioners' expert, who testified that he had measured crawl space ACH values of 1.1, 2.4 and 4.4 at three houses in Northern California and Portland, Oregon, argued that 3.0 was a more appropriate ACH value. He also stated that the ACH values of 12.0 and 21.4 measured by TWCA in Albany-area houses were theoretically impossible.

EFSC found that the proper ACH value was 7.0, relying on the estimate made by TWCA's experts. EFSC rejected petitioners' expert's suggested value because ACH is greatly influenced by climatic factors, and petitioners' expert's estimate was based upon measurements made in houses outside the Albany area. EFSC did not, however, compare the actual climatic conditions during the periods in which ACH was measured at the various houses. In the absence of such a comparison by EFSC, we do not find its reason for rejecting petitioners' data particularly convincing. Moreover, given the evidence in the record, we are somewhat dubious of the validity of the 12.0 and 21.4 ACH values measured by TWCA. On the other hand, TWCA's experts questioned the accuracy of the measurements made by petitioners' expert. In sum, although we might have been persuaded to choose a lower ACH value, the evidence in the record is not such that we can say that it would have been unreasonable for EFSC to choose an ACH value of 7.0.[12]

---

[12] Petitioners contend that EFSC arrived at the value of 7.0 ACH by "averaging" the various ACH values presented to it. They argue that, because of the nature of the mathematical model used by EFSC, averaging ACH values would not accurately produce an average radon-222 concentration value. We are not persuaded, however, that EFSC averaged the ACH values presented to it. EFSC adopted the ACH value presented by TWCA and merely noted that this value was near the center of the range of ACH values presented to it.

E. *Percentage of Air Entering the House from the Crawl Space*

■ In the model adopted by EFSC, radon-222 enters the living area of the house from the outside air and from the crawl space. Because the radon-222 concentration in the crawl space is ordinarily higher than that of the outside air, the fraction of air entering the living area from the crawl space ($X_f$) is a crucial determinant of the radon-222 concentration in the living area. Relying on expert testimony that it was proper to assume that air leakage around the surface of the living area of a house was uniform, EFSC chose an $X_f$ value of 0.34 because the floor area of a 1,250 square-foot house with an 8-foot ceiling is 34 percent of the house's surface.

Petitioners' expert contended that the equal-leakage assumption ignored the effect of heated air rising within a house. Using data from studies of three houses, the expert testified that 0.55 was a more appropriate value for $X_f$. TWCA countered that petitioners' expert ignored the effect of wind speed and that an Oregon Department of Energy study of 56 houses found an $X_f$ value of 0.20. EFSC's consultant testified that the equal-leakage assumption was acceptable for lack of sufficient scientific evidence to the contrary. Given this evidentiary record, EFSC's finding was reasonable.

F. *Equilibrium Factors*

■ As we discussed in part IV, the translation of a radon-222 concentration into working levels requires the application of an "equilibrium factor." Using equilibrium factors reported in the scientific literature, EFSC chose an equilibrium factor of 0.4 for indoor air and 0.45 for outdoor air. Petitioners' expert testified that his review of the scientific literature showed that an equilibrium factor of 0.4 to 0.5 was "reasonable." The expert contended, however, that equilibrium factors were difficult to estimate and that it would be more protective of public health to assume an equilibrium factor of 1.0, *i.e.,* to assume perfect equilibrium between radon-222 and its "daughters." EFSC could, upon this evidence, reasonably have found that 0.4 and 0.45 were the appropriate equilibrium factors. We have discussed above petitioners' arguments concerning the health consequences of using working levels as a measure of radioactivity.

## VI.

Finally, petitioners contend that EFSC committed several unrelated procedural errors. We discuss each contention in turn.

A. *Failure to Perform an Independent Study*

First, petitioners contend that EFSC erred in failing to perform an independent study of TWCA's waste. In its order, EFSC wrote:

"TWCA commissioned Battelle Pacific Northwest Laboratories (Battelle) to conduct a study of the proposed site. Under ORS 469.360 [EFSC] has authority to cause an independent study of the proposed site. Such study was requested by [petitioners] early in these proceedings. [EFSC] previously determined that such study would be conducted only if an independent audit of Battelle's study showed the study to be biased or not conducted in accordance with current scientific methods. The auditor's report concludes that the Battelle study was conducted in accordance with current scientific methods and that it is not biased. [EFSC] agrees with this conclusion and declines to order an independent study."

Petitioners argue that EFSC should not have relied upon an auditor and that, even if it was proper for EFSC to do so, the auditor found inadequacies in Battelle's study and did not review portions of Battelle's work.

██ ORS 469.360(1) provides that EFSC, as part of its evaluation of a proposed facility, "*may* commission an independent study" of any aspect of the proposed facility. (Emphasis added.) This provision gives EFSC the authority to commission an independent study (as well as the authority to make the applicant fund the study) but does not require an independent study. ORS 469.470(1) provides that EFSC "*shall* * * * [c]onduct and prepare, independently *or in cooperation with others,* studies, investigations, research and programs relating to all aspects of site selection." (Emphasis added.) This provision is mandatory, but whether it relates to a specific site certificate application or to more general investigations of appropriate sites is not clear. *Compare* ORS 469.470(2) (designation of suitable and unsuitable sites for various types of energy facilities) *with* ORS 469.360(1) (providing for investigations of specific site applications). It is also not clear that an auditor's study does not qualify as an

"independent study." In any event, the provision by its own terms does not mandate an independent investigation of TWCA's site by EFSC itself.

As for the auditor's study, EFSC must judge the adequacy of Battelle's investigation. In this case, the auditor did generally approve of Battelle's investigation, but a conclusion by the auditor to the contrary would not necessarily have required EFSC to conclude that Battelle's investigation was inadequate. EFSC did not act unlawfully in refusing petitioners' requests to order an independent study. *See* ORS 183.482(8)(b).

B. *"Ex Parte" Contacts*

Petitioners contend that the proceedings before EFSC were "fatally flawed by massive undisclosed ex parte contact." The "ex parte" contacts to which petitioners refer were (1) correspondence between EFSC's auditor and Battelle concerning the adequacy of certain aspects of Battelle's investigation and (2) TWCA's submission of objections to the hearing officer's proposed order directly to the members of EFSC in addition to the hearing officer and the other parties. None of these communications can be considered "ex parte." EFSC's auditor was an expert witness for EFSC, not a decision-maker, and a communication simultaneously served on other parties to an adversary proceeding is not an "ex parte" communication. In any event, the Oregon APA does not prohibit ex parte communications; it requires only that such communications be disclosed and that other parties be given an opportunity to rebut the substance of the communications. ORS 183.462. The communications between EFSC's auditor and Battelle were disclosed to the other parties (albeit after the fact) and made part of the record for the purpose of showing the substance of the communications, but not as evidence.

C. *Exclusion of Evidence*

Petitioners argue that the EFSC hearing officer "consistently denied" them an opportunity to present relevant evidence. They point to only two instances of this "consistent" denial, one of which was raised for the first time in their reply brief. It is clear from the record that these instances involved irrelevant testimony. Both rejections occurred near the end of the proceedings when the record was reopened to

permit testimony on two narrow issues. The first rejection was of "prefiled" testimony that petitioners themselves considered irrelevant to the pending proceeding because the offer of the testimony was accompanied by a request that the scope of the proceedings be expanded to cover the testimony. The second rejection was of testimony that was a response to evidence that EFSC intended to place in the record but did not. Petitioners argue that TWCA did not timely object to the first mentioned testimony, but, even were this so, petitioners cite no authority that would have prevented the hearing officer from excluding irrelevant evidence on his own motion. *Cf.* ORS 183.450(1) ("[i]rrelevant * * * evidence shall be excluded").

D. *"Official Notice"*

■ Finally, petitioners contend that EFSC improperly took "official notice" of a scientific article on the relationship of radon-222 concentration to height. EFSC informed the parties in advance that it planned to take "official notice" of the article. EFSC then placed the article in the record as an EFSC exhibit over the objections of both petitioners and TWCA. TWCA does not challenge the admission of the article on appeal.

Because the article was made a part of the record, an argument that EFSC took improper notice of the article is inappropriate. Even were it appropriate, EFSC could take notice of the article so long as the parties were given notice and an opportunity to contest the facts in the article. *See* ORS 183.450(4). EFSC provided notice and opportunity.

The decision of the Energy Facility Siting Council is affirmed.