No. 35 December 7, 2023 673

IN THE SUPREME COURT OF THE
STATE OF OREGON

PNW METAL RECYCLING, INC.,
dba Rivergate Scrap Metals,
dba RS Davis Recycling,
dba PNW Auto Parts,
dba Orient Auto Parts and Recycling,
an Oregon corporation;
Schnitzer Steel Industries, Inc.,
an Oregon corporation;
and Pacific Recycling, Inc.,
an Oregon corporation,
*Respondents on Review,*

*v.*

OREGON DEPARTMENT OF
ENVIRONMENTAL QUALITY,
an agency of the State of Oregon,
*Petitioner on Review.*

(CA A171317) (SC S069412)

On review from the Court of Appeals.*

Argued and submitted November 17, 2022.

Denise G. Fjordbeck, Assistant Attorney General, Salem, filed the opening brief for petitioner on review. Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the reply brief for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jon W. Monson, Cable Huston LLP, Portland, and Crystal S. Chase, Stoel Rives LLP, Portland, argued the cause and filed the brief for respondents on review. Also on the brief were Nicole M. Swift and Nicole A. W. Abercrombie, Cable Huston LLP, Portland, and Kirk B. Maag, Stoel Rives LLP, Portland.

_____

* On judicial review from a decision of the Department of Environmental Quality. 317 Or App 207, 505 P3d 462 (2022).

Lindsay Thane, Schwabe, Williamson & Wyatt PC, Portland, filed the brief for *amici curiae* Northwest Pulp & Paper Association, Oregon Business & Industry Association, Oregon Farm Bureau, Oregon Forest Industries Council, and Oregonians for Food and Shelter.

Jennifer Gates, Pearl Legal Group, Portland, filed the brief for *amicus curiae* Institute of Scrap Recycling Industries Pacific Northwest Chapter.

Before Flynn, Chief Justice, Duncan, Garrett, DeHoog, and Masih, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.**

GARRETT, J.

The decision of the Court of Appeals is vacated. The judicial review is dismissed.

**Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. Bushong and James, JJ., did not participate in the consideration or decision of this case.

———————

** Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. Bushong and James, JJ., did not participate in the consideration or decision of this case.

**GARRETT, J.**

Under ORS 459.205, a person operating a solid waste disposal site must obtain a permit from the Department of Environmental Quality (DEQ). Before 2018, DEQ did not apply that permit requirement to facilities that dismantled and recycled used vehicles, even if those facilities also disposed of other solid waste. Petitioners operate facilities that engage in both vehicle and nonvehicle recycling and which, therefore, historically were not subject to the permit requirement.[1] In 2018, DEQ informed petitioners that the agency had changed its view of the relevant statutes and that, based on that revised interpretation, petitioners would be required to obtain permits.

Petitioners initiated this challenge under ORS 183.400, contending that DEQ's change of position constituted a "rule" under the Oregon Administrative Procedures Act (APA); that DEQ had adopted the rule without following APA rulemaking procedures; and that DEQ could not lawfully promulgate a rule in any event because DEQ lacks rulemaking authority. Agreeing with petitioners that DEQ had improperly adopted a rule, the Court of Appeals held DEQ's decision invalid. *PNW Metal Recycling, Inc. v. DEQ*, 317 Or App 207, 213, 505 P3d 462 (2022).

DEQ sought review, which we allowed. For the reasons explained below, we conclude that petitioners' rule challenge under ORS 183.400 must be dismissed. DEQ's internal decision to adopt a new interpretation of a statute is not, by itself, a "rule." We vacate the decision of the Court of Appeals and dismiss the judicial review.

## I.   BACKGROUND

This case presents an important question of administrative law, the resolution of which turns on several distinct statutory schemes. A brief overview of those statutes will provide helpful context for understanding the facts that led to this dispute. Accordingly, we begin by describing,

---

[1] In requesting judicial review of the validity of an agency rule, the party requesting review is denominated the "petitioner." ORS 183.400. Thus, although PNW Metal Recycling *et al.* are the respondents on review in this court, we refer to those participants as "petitioners" throughout this opinion.

first, the relevant provisions of the APA; second, statutes establishing DEQ and setting out its authority; and third, statutes regulating solid waste disposal. After doing so, we discuss the historical facts.

A. *Oregon APA Requirements*

Executive branch agencies perform functions that can be described as legislative (adoption of rules), executive (enforcement of statutes and rules), or adjudicative (determination of rights and obligations in particular cases). In all events, an agency's authority is defined by the legislature. An agency is a creature of statute, and the scope of its substantive power is set forth in and circumscribed by its enabling statute. *See SAIF v. Shipley*, 326 Or 557, 561, 955 P2d 244 (1998) ("[A]n agency has only those powers that the legislature grants and cannot exercise authority that it does not have."); *Trebesch v. Employment Division*, 300 Or 264, 267, 710 P2d 136 (1985) ("The authorizing statutes will specify whether rulemaking or adjudication authority, or both, are delegated to the agency and will indicate the agency's tasks, the breadth of the agency's discretion to carry out these tasks, and the process by which they are to be accomplished."). For example, an enabling statute might articulate a legislative policy objective such as clean air or clean water, direct an agency to further that goal, and authorize the agency to undertake specific actions in doing so, such as promulgating rules, issuing permits or licenses, and initiating enforcement actions.

In ORS chapter 183, the APA, in turn, sets out a series of procedures that generally govern state agencies in the performance of those functions, as well as judicial review of agency action. At the heart of the APA is the distinction between procedures applicable to an agency's exercise of its legislative function—which results in a "rule"—and those governing an agency's use of its executive and adjudicatory powers—which are exercised through "orders," sometimes following "contested cases."

"Rules," as a species of lawmaking, are meant to apply generally. Subject to exceptions discussed further below, the APA defines "rule" as "any agency directive,

standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). ORS 183.325 to 183.410 set out detailed requirements for agency rulemaking proceedings, including the requirements of public notice and opportunity for comment by interested persons, ORS 183.335; filing and publication of rules, ORS 183.355, ORS 183.360, ORS 183.365; and a provision invoked in this case by which a person may challenge the validity of a rule by filing a petition with the Court of Appeals, ORS 183.400.

"Orders," in contrast, are particularized. Subject to exceptions, the APA defines "order" as "any agency action expressed orally or in writing directed to a named person or named persons, other than employees, officers or members of an agency. 'Order' includes any agency determination or decision issued in connection with a contested case proceeding." ORS 183.310(6)(a).

A "contested case" is defined as follows:

"(a)  'Contested case' means a proceeding before an agency:

"(A)  In which the individual legal rights, duties or privileges of specific parties are required by statute or Constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard;

"(B)  Where the agency has discretion to suspend or revoke a right or privilege of a person;

"(C)  For the suspension, revocation or refusal to renew or issue a license where the licensee or applicant for a license demands such hearing; or

"(D)  Where the agency by rule or order provides for hearings substantially of the character required by [certain other provisions of the APA].

"(b)  'Contested case' does not include proceedings in which an agency decision rests solely on the result of a test."

ORS 183.310(2). In ORS 183.411 to 183.471, the APA prescribes procedures for contested cases, including

requirements of notice, opportunities for discovery, introduction of evidence, representation by counsel, and entry of final orders with findings of fact and conclusions of law.

The APA thus contemplates that, as a general matter, an agency's application of law or policy to particular facts will occur through an order (sometimes following a contested case), while an agency action that "implements, interprets or prescribes law or policy" in a way that has "general applicability," ORS 183.310(9), will occur through rulemaking. But that general distinction has an important exception. The APA also provides:

> "A rule is not valid or effective against any person or party until the rule is filed in accordance with this section. However, if an agency, in disposing of a contested case, announces in its decision *the adoption of a general policy applicable to the case and subsequent cases of like nature the agency may rely upon the decision in disposition of later cases*."

ORS 183.355(6) (emphasis added). Thus, in a contested case proceeding, an agency may make a statement that otherwise has the character of a rule—because it is an "adoption of a general policy" applicable not only to the case but to "cases of like nature." And, in that event, the agency may apply the policy prospectively even though it was adopted without the notice-and-comment features of formal rulemaking. To put it another way, the fact that an agency makes a statement of policy that is consistent with the definition of "rule" does not mean that the agency must make that statement through rulemaking proceedings. *See Homestyle Direct, LLC v. DHS*, 354 Or 253, 265-66, 311 P3d 487 (2013) ("Merely because a given administrative standard or policy satisfies the statutory definition of a 'rule' under the [APA] does not necessarily mean that it is invalid unless preceded by notice and comment rulemaking proceedings." (Citing ORS 183.355(6).)). As we will explain later in this opinion, in some circumstances an agency must use rulemaking rather than the contested case process to announce policy; whether that is so, however, is determined not by the APA, but, instead, by the agency's substantive enabling statutes.

B. *DEQ and EQC*

The legislature has enacted an extensive statutory scheme for environmental protection, addressing matters ranging from solid waste management (ORS chapter 459) to air quality (ORS chapter 468A) to water quality (ORS chapter 468B) to hazardous waste (ORS chapters 465 and 466), among others.

ORS chapter 468 establishes two entities with significant responsibility for administering and enforcing that regulatory scheme: the Environmental Quality Commission (EQC) and DEQ. ORS 468.010 provides that the EQC consists of five members appointed by the Governor and confirmed by the Senate. ORS 468.015 states that the function of EQC is to "establish the policies for the operation of [DEQ]." ORS 468.020(1) provides that EQC "shall adopt such rules and standards as it considers necessary and proper in performing the functions vested by law in the [EQC]," with such adoption of rules and standards to be made "[i]n accordance with the applicable provisions of [the APA]." Thus, the EQC has an express grant of authority to make "rules" that are necessary to carry out the functions vested in it by statute.

DEQ is separately created by ORS 468.030, which provides that the department exists "under" EQC and consists of a "[d]irector" and other personnel. ORS 468.040 provides that the DEQ director is appointed by the EQC and serves at the pleasure of the commission. ORS 468.035 sets out a list of specific functions to be performed by DEQ "[s]ubject to policy direction by [EQC]," and ORS 468.045(1)(c) generally provides that the purpose of DEQ, through its director, is to "[a]dminister and enforce the laws of the state concerning environmental quality."

The statutory scheme accordingly contemplates a basic division of functions whereby EQC has the responsibility to establish "policies" for the operation of DEQ and the authority to adopt "rules and standards" to carry out its statutory duties, while DEQ is directed to "[a]dminister and enforce" the environmental laws "[s]ubject to policy direction" by EQC.

C.  *Solid Waste Disposal and Permitting*

Among numerous subjects of environmental regulation, the legislature has enacted a statutory scheme for "solid waste management," codified in ORS chapter 459.

"Solid waste" is defined to mean

"all useless or discarded putrescible and nonputrescible materials, including but not limited to garbage, rubbish, refuse, ashes, paper and cardboard, sewage sludge, septic tank and cesspool pumpings or other sludge, useless or discarded commercial, industrial, demolition and construction materials, *discarded or abandoned vehicles or parts thereof*, discarded home and industrial appliances, manure, vegetable or animal solid and semisolid materials, dead animals and infectious waste as defined in ORS 459.386. 'Solid waste' does not include:

"(a)  Hazardous waste as defined in ORS 466.005.

"(b)  Materials used for fertilizer or for other productive purposes or which are salvageable as such materials are used on land in agricultural operations and the growing or harvesting of crops and the raising of animals.

"(c)  Woody biomass that is combusted as a fuel by a facility that has obtained a permit described in ORS 468A.040."

ORS 459.005(25) (emphasis added). As defined, solid waste includes a wide range of material, including, as relevant to this case, "discarded or abandoned vehicles or parts thereof." *Id.*

ORS 459.045 addresses rulemaking by EQC in the area of solid waste management. ORS 459.045(1) states that EQC "shall" adopt rules pertaining to certain aspects of solid waste management, and ORS 459.045(2) states that the commission "may" adopt other rules; that statute does not, however, specifically address rulemaking with respect to the issuance or denial of permits. The parties have identified no statute, and we are aware of none, that grants DEQ rulemaking authority on that subject.

Several provisions of ORS chapter 459 deal with "disposal sites." As relevant here, ORS 459.205 states that

"a disposal site shall not be established, operated, maintained or substantially altered, expanded or improved, and a change shall not be made in the method or type of disposal at a disposal site, until the person owning or controlling the disposal site obtains a permit therefor from the Department of Environmental Quality as provided in ORS 459.235."

Under that statute, DEQ is charged with issuing permits for "disposal sites." The legislature has defined a "disposal site" as follows:

"(a) 'Disposal site' means land and facilities used for the disposal, handling or transfer of, or energy recovery, material recovery and recycling from solid wastes, including but not limited to dumps, landfills, sludge lagoons, sludge treatment facilities, disposal sites for septic tank pumping or cesspool cleaning service, transfer stations, energy recovery facilities, incinerators for solid waste delivered by the public or by a collection service, composting plants and land and facilities previously used for solid waste disposal at a land disposal site.

"(b) 'Disposal site' does not include:

"*****

"(D) A site operated by a dismantler issued a certificate under ORS 822.110."

ORS 459.005(8). Thus, the definition of a "disposal site" that cannot be operated without a permit from DEQ *excludes* sites operated pursuant to a "certificate under ORS 822.110." ORS 822.110 is part of the Oregon Vehicle Code and provides for the Oregon Department of Transportation (ODOT) to issue a "dismantler certificate" to entities that meet specified requirements.

To summarize, the legislature has provided that DEQ shall be responsible for administering a mandatory permit program for solid waste disposal sites, ORS 459.205, and the legislature has further provided that "solid waste" includes "discarded or abandoned vehicles or parts thereof." ORS 459.005(25). At the same time, the legislature has stated that a "disposal site" for which permits are required does *not* include a "site" operated by a person that has obtained a vehicle "dismantler certificate" from ODOT. ORS

459.005(8)(b)(D). We refer to that statute throughout this opinion as the "auto-dismantler exception." The interplay among those provisions is central to the parties' arguments in this case.

D.  *Factual Background*

The relevant facts are largely procedural and are undisputed. Petitioners operate scrap metal recycling facilities that accept and process both vehicular and nonvehicular materials. Those materials fall within the statutory definition of "solid waste" under ORS 459.005(25). Petitioners also, however, hold vehicle dismantler certificates issued by ODOT under ORS 822.110.

Before the events giving rise to this case, DEQ had not applied ORS 459.205, the statute that requires permits for solid waste disposal sites, to facilities that hold vehicle dismantler certificates, even if those facilities engaged in other solid waste disposal functions. Instead, DEQ required a facility to obtain a solid waste disposal permit only if the facility had no vehicle processing operations. The record does not reflect the reason for that historical practice by DEQ.

A March 2018 fire at a Portland automobile shredding facility (not operated by either of the petitioners) prompted DEQ to undertake a review to "identify potential gaps in environmental regulation of automobile dismantlers." In an internal memorandum in August of that year, DEQ staff noted the following about the auto-dismantler exception:

> "DEQ historically has applied the statutory exemption from solid waste management regulation as applying to an entire operation, even if that operation includes solid waste other than automobiles. Nevertheless, the statutory exemption could be applied narrowly to only cover auto dismantling operations—leaving other solid waste activities subject to regulation."

Interpreting the auto-dismantler exception in ORS 459.005(8)(b)(D) more narrowly was just one of several options that the staff memorandum identified. Other options included: (1) maintaining the status quo; (2) formally

adopting new administrative rules for "interpreting the [auto-dismantler] exclusion"; (3) proposing a bill to the legislature to "remove or clarify the auto dismantler exemption"; and (4) proposing a bill to the legislature to "direct DEQ to issue permits or take other specific actions."

In July and November 2018, following separate site inspections of petitioners' facilities, DEQ informed petitioners in writing that their facilities would be subject to the permitting requirement for nonvehicular waste processing, even though those facilities held dismantling certificates from ODOT. In December, DEQ staff met with representatives of petitioner PNW Metal Recycling. At that meeting, DEQ staff acknowledged that, "historically, we've said, if you had the DMV [auto-dismantler] certificate, then you're not defined as a disposal site by law." DEQ staff then explained the agency's change of view, *viz.*, that "[DEQ has] clarified *** that, for those facilities that accept other types of waste materials in addition to vehicles, they are a disposal site, and they should be regulated under a DEQ permit." During the meeting, agency staff also indicated that DEQ intended to apply the permitting requirement to other similarly situated facilities, not just petitioners.

Petitioners chose to challenge DEQ's decision by initiating this proceeding under ORS 183.400, which provides that "[t]he validity of any rule may be determined upon a petition by any person to the Court of Appeals." ORS 183.400(1). Petitioners argued that DEQ's new interpretation of the auto-dismantler exception was a "rule," that DEQ had failed to follow rulemaking procedures, and that DEQ lacked rulemaking authority. Petitioners advanced only those procedural arguments; they did not argue that DEQ's new interpretation was substantively incorrect. DEQ sought to dismiss, arguing that ORS 183.400 is inapplicable because the agency had not promulgated a "rule." The Appellate Commissioner concluded that the question of whether the challenged action was a rule warranted resolution by a panel.

Before the Court of Appeals panel, petitioners pressed their arguments that DEQ's decision to change its interpretation of the auto-dismantler exception constituted

a new rule, that the rule had been adopted without following APA rulemaking procedures, and that DEQ lacked the statutory authority to engage in rulemaking in any event. In response, DEQ agreed that, if the agency's decision constitutes a rule, it is invalid, but argued that no rule had been adopted.

The Court of Appeals agreed with petitioners. After consulting the definition of "rule" in ORS 183.310(9) ("any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency"), the Court of Appeals concluded that DEQ's action met that definition. *PNW Metal Recycling, Inc.*, 317 Or App at 213. Relying on its own case law, that court reasoned that DEQ's evolving interpretation of the auto-dismantler exception showed that multiple interpretations are "reasonable," and DEQ's decision to change its interpretation was therefore a "new exercise of agency discretion[,] which must be promulgated as a rule to be valid." *Id.* at 212 (internal quotation marks omitted). The Court of Appeals rejected DEQ's argument that the agency's action was not "generally applicable," noting that the agency had stated its intention to apply its new interpretation to other similarly situated facilities in addition to those operated by petitioners.

DEQ sought review of the Court of Appeals decision, which we allowed.

## II.   ANALYSIS

A.  *Brief Overview*

At the outset, we note the peculiar posture of the case before us. This proceeding is ostensibly a challenge under ORS 183.400 to the validity of DEQ's "rule." But the agency disputes that it adopted any rule; moreover, the gravamen of petitioners' argument is that rulemaking was required and did not occur. Petitioners further contend that, although rulemaking was required, *DEQ* could not have done it, because the agency lacks statutory authority to promulgate rules; only EQC can do that. In sum, petitioners argue that DEQ made a decision that constitutes a "rule"; that DEQ did not comply with rulemaking procedures and

lacked the power to do so; but that the type of decision DEQ made is nevertheless one that required rulemaking.

As discussed below, DEQ's internal decision to adopt a new interpretation of the auto-dismantler exception was not a "rule." In explaining that conclusion, we address certain premises underlying petitioners' arguments and the Court of Appeals decision that are not entirely correct. Petitioners contend, for example, that DEQ's decision to change its interpretation of the auto-dismantler exception was a discretionary policy choice that could *only* be made through rulemaking. Implicit in that argument is the assumption that, if an agency's action makes "policy" or is otherwise consistent with the definition of rule in ORS 183.310(9), then that action must occur through rulemaking procedures. That assumption is contrary to our case law. As noted earlier in this opinion, the APA provides that agency announcements of policy may also occur in contested cases. But the APA does not determine when one of those mechanisms or the other must be used. In several cases, this court has explained that agencies must use rulemaking in certain circumstances; when that is so, however, it is not because the *APA* requires it. Whether an agency must use rulemaking in a particular situation is a function of the agency's substantive authority as defined by its enabling statutes.

Petitioners have not attempted to demonstrate that the legislature intended for the application of the auto-dismantler exception to be handled through rulemaking. Without a properly developed argument that rulemaking was the required path, petitioners are left to rely solely on the APA's definition of "rule" to argue that DEQ's actions were procedurally improper. Based on the larger context of the APA and principles of administrative law set out in this court's cases, we conclude that petitioners are mistaken.

B.  *Definition of "Rule"*

ORS 183.310(9) provides, in full:

> "'Rule' means any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency. The term

includes the amendment or repeal of a prior rule, but does not include:

"(a)   Unless a hearing is required by statute, internal management directives, regulations or statements which do not substantially affect the interests of the public:

"(A)   Between agencies, or their officers or their employees; or

"(B)   Within an agency, between its officers or between employees.

"(b)   Action by agencies directed to other agencies or other units of government which do not substantially affect the interests of the public.

"(c)   Declaratory rulings issued pursuant to ORS 183.410 [(agency determination of applicability of rule or statute to petitioner)] or 305.105 [(declaratory rulings by department)].

"(d)   Intra-agency memoranda.

"(e)   Executive orders of the Governor.

"(f)   Rules of conduct for persons committed to the physical and legal custody of the Department of Corrections, the violation of which will not result in:

"(A)   Placement in segregation or isolation status in excess of seven days.

"(B)   Institutional transfer or other transfer to secure confinement status for disciplinary reasons.

"(C)   Disciplinary procedures adopted pursuant to ORS 421.180 [(disciplinary procedures)]."

This court has not previously decided a case turning on the definition of "rule," although we have observed that the definition is broad. *See, e.g.*, *Morgan v. Stimson Lumber Company*, 288 Or 595, 602-03, 607 P2d 150 (1980) ("[A]n agency makes a rule, within the broad meaning of that term, when it does nothing more than publish its official position on how it interprets a requirement, standard, or procedure[.]").

        Before proceeding further, we pause to be clear about petitioners' assertion as to the nature of the "rule" that DEQ adopted. Petitioners rely on the 2018 staff memorandum

proposing a different interpretation of the auto-dismantler exception; petitioners further rely on DEQ's written and oral communications explaining that decision to petitioners. Petitioners do not contend, however, that any such document or communication, alone or in the aggregate, constitutes the rule. (Petitioners also acknowledge that the definition of "rule" specifically exempts "intra-agency memoranda.") Rather, petitioners cite those documents and communications as "evidence" of the rule, which petitioners describe as follows: "It is DEQ's *decision* to change that interpretation based on a discretionary choice to impose additional oversight to achieve certain policy goals which constitutes the 'rule' under ORS 183.310(9)." Similarly, the Court of Appeals concluded that DEQ's *decision* to change its interpretation was a "new exercise of agency discretion[,] which must be promulgated as a rule to be valid." *PNW Metal Recycling, Inc.*, 317 Or App at 212 (internal quotation marks omitted).

As a textual matter, it is doubtful that DEQ's internal *decision* about how to interpret the statute—as opposed to some expression of that decision—satisfies the definition of a rule in ORS 183.310(9). An agency's internal decision about how to construe a statute is not self-executing. ORS 183.310(9) refers to an "agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy." The APA does not further define "directive, standard, regulation or statement of general applicability," but those terms appear to contemplate a decision that has been made manifest or apparent in some way. In that regard, petitioners argue that DEQ's action can be described variously as a

> "'directive' (because it directed certain action), a 'standard' (because it established criteria for whether an auto dismantler needs to apply for a solid waste permit), a 'regulation' (because it had the effect of regulating certain auto dismantlers by requiring them to apply for a solid waste permit), and a 'statement' (because its actions were memorialized in at least the 2018 memorandum and in oral statements by senior DEQ staff)."

None of those points is implausible. Importantly, however, that aspect of petitioners' argument shifts the focus from DEQ's interpretive decision to the manner in which DEQ

articulated that decision. Yet petitioners simultaneously contend that it is DEQ's "decision" alone that constitutes the rule.

In short, although petitioners rest their arguments on ORS 183.310(9), their arguments based on that definition are somewhat inconsistent. As a result, that statutory text cannot quite support the weight that petitioners place on it. More importantly, the definition of "rule" does not exist in a vacuum, and the viability of petitioners' theory ultimately depends on whether it comports with the text of the definition when understood in the context of the APA as a whole. We turn to that question.

## C.   *Other APA Provisions*

As noted earlier in this opinion, agencies are creatures of statute. The legislature, in creating an agency, determines what powers the agency will have, including the powers of rulemaking, adjudication, or both. *Shipley*, 326 Or at 561; *Trebesch*, 300 Or at 267. Agencies often (though not always) are granted an array of powers that can be described as legislative (rulemaking), executive (enforcing statutes and rules), and adjudicative (resolving particular cases). An agency with rulemaking authority is subject, by default, to the procedural requirements of the APA, unless the legislature specifies otherwise. *See* ORS 183.335 (setting forth process for notice, content, and public comment on proposed rules). The rulemaking process includes the opportunity for the public to provide information to the agency in response to proposed rules and for interested parties to request hearings. *Id.*

Agencies also may have adjudicatory functions. Those functions include the authority to hear contested cases and "other than contested cases"—to resolve cases and issue orders. ORS 183.310(2) (defining "contested case"); ORS 183.310(6) (defining "order"). As noted earlier, the APA specifically allows agencies to use the contested case process to adopt general policies that may be applied prospectively to different parties. ORS 183.355(6). The announcement of such a general policy may have the hallmarks of a "rule" under the APA's definition of that term, ORS 183.310(9),

because it is an interpretation or statement of law or policy that will have prospective effect; yet the APA allows such statements of policy to be made in a contested case proceeding rather than through rulemaking.

The APA also provides that a person may seek a "declaratory ruling" from an agency "with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it." ORS 183.410. Such rulings are specifically excluded from the definition of "rule." ORS 183.310(9)(c). Moreover, ORS 183.410 provides that a declaratory ruling is reviewable by the Court of Appeals "in the manner provided in ORS 183.480 [(judicial review of agency orders)] for the review of orders in contested cases." The APA thus contemplates that a request under ORS 183.410 is another avenue, in addition to rules and contested cases, through which an agency might issue a statement that announces or implements an interpretation of law or policy. Such statements are reviewable as if they had been issued in an *order* following a contested case proceeding. The legislature has provided distinct paths to judicial review for different types of agency actions.[2] By specifying that declaratory rulings and adoptions of policy in connection with contested cases are reviewable as orders, the APA makes clear that not all announcements and interpretations of law or policy are "rules" subject to facial challenge under ORS 183.400.

For those reasons, petitioners' focus on the various ways in which DEQ's action is consistent with the APA definition of "rule" is incomplete. Petitioners' arguments proceed from the premise that, if an agency makes a policy choice, that choice requires rulemaking. But that is not so. *See Homestyle Direct*, 354 Or at 266 ("[T]he APA provides that agencies are authorized to adopt general policies that

---

[2] The APA contains separate provisions for judicial review of rules and orders. *See* ORS 183.400 (review of rules); ORS 183.410 (review of declaratory rulings regarding the applicability of a rule or statute to an adverse party); ORS 183.482 (review in contested cases); ORS 183.484 (review in other than contested cases); *see also* ORS 183.400(1) (stating that a person may not bring a rule challenge under that statute "when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court"); ORS 183.400(2) (providing mechanism—separate from that which allows a party to challenge a rule in the Court of Appeals under ORS 183.400(1)—through which a party can challenge a "rule" during an enforcement proceeding).

otherwise would qualify as 'rules' during contested case proceedings, without going through notice-and-comment rulemaking.").[3]

D.  *Case Law*

As just explained, the APA provides that rulemaking and contested case proceedings are both avenues through which agencies may announce policy. That is not to say that agencies may freely choose between those mechanisms. In several cases, this court has addressed the circumstances in which agencies must engage in rulemaking as a predicate to enforcement. Those cases arose in a different posture than this one: They involved judicial review of a contested case rather than a rule challenge. Nevertheless, because the administrative law principles discussed in those cases provide helpful context for understanding and resolving petitioners' arguments in this case, we discuss them below.

The question of whether and when an agency *must* use rulemaking proceedings was first addressed in *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980). In *Megdal*, the board revoked the petitioner's license to practice dentistry pursuant to the board's statutory authority to regulate the profession and discipline licensees for "unprofessional conduct." 288 Or at 295. The statute did not define "unprofessional conduct"; although the board had rulemaking authority, the board also had not promulgated rules defining that term.

This court concluded that the undefined term "unprofessional conduct" reflected a delegation from the legislature to the board "to expand the list of conduct deemed unprofessional for disciplinary purposes by rules." *Id.* at 316. We further reasoned that the board *could* lawfully have interpreted "unprofessional conduct" to include the type of fraudulent business practice in which the petitioner had engaged. But because the board had not done so, no source

---

[3] This point should not be taken to mean that if an agency *chooses* the rulemaking path when it could have chosen a different path, it may be excused from complying with applicable rulemaking procedures. Situations may arise in which an agency chooses to announce policy through a rule even though the agency could have used the contested case process. If the agency chooses to announce a rule, it must act consistently with the APA in doing so.

of law permitted the sanction. *See id.* at 321 ("No such rule having been made to proscribe the kind of conduct charged against petitioner, there was no legal ground on which to revoke his license."). In short, *Megdal* held that the statute in question delegated a policymaking function to the board, which could not be exercised in the first instance through adjudication.

Two years after *Megdal*, this court decided *Ross v. Springfield School Dist. No. 19*, 294 Or 357, 657 P2d 188 (1982), a teacher discipline case. After being terminated from the Springfield School District, the petitioner sought review by the Fair Dismissal Appeals Board (FDAB) under ORS 342.905, which affirmed the dismissal. *Id.* at 359. Before this court, the petitioner argued that "prior rulemaking pursuant to the [APA] is required under [*Megdal*] before the FDAB may engage in adjudication in individual cases." *Id.* at 367. We disagreed, explaining that *Megdal* involved statutory terms of "delegation," whereas FDAB's statutory authority was merely "interpretive." *Id.* We concluded, "When applying terms of *complete* legislative expression, an agency may interpret statutory standards *either* by an interpretive rule or by order in a contested case." *Id.* at 368-69 (emphases added).

In *Trebesch*, we further refined the analysis for determining whether prior rulemaking was required. In that case, the claimant was denied unemployment benefits based on the agency's determination that the claimant had not fulfilled the statutory requirement of a "systematic and sustained effort to obtain work." 300 Or at 266. On judicial review, the claimant argued that the Employment Division was required to have promulgated a rule defining that statutory phrase before using it as a basis to deny benefits in an individual case. The claimant argued that the phrase was "unavoidably delegative," *id.* at 269, such that rulemaking was required under *Megdal*. The agency relied on *Ross*, arguing that the agency's role was limited to interpreting the phrase. *Trebesch*, 300 Or at 269-70.

Although that dichotomy had its origins in *Megdal* and *Ross*, we explained that the analysis was more nuanced—whether rulemaking was required could not be

determined solely by characterizing the statutory term as delegative or not:

> "[C]ategorizing a statutory term for purposes of the scope of judicial review does not by itself compel a particular consequence with regard to rulemaking.
>
> "\* \* \* \* \*
>
> "*Megdal* does not mean that all terms delegating policymaking discretion can be applied only after rulemaking. Nor does *Ross* mean that terms delegating interpretive responsibility may always be applied as the agency chooses, either by rule or by adjudication. Both cases address only the requirement for rulemaking in the individual agencies at issue in the cases.
>
> "It is always possible for the legislature explicitly to require an agency to define any type of statutory term by rulemaking. \* \* \* In the absence of an explicit directive, the breadth and kind of responsibility delegated to the agency by the statutory term (fact-finding, applying an ambiguous law, or developing policy) will be one, but not a dispositive, factor which may indicate an implicit directive from the legislature for rulemaking. In addition, the tasks the agency is responsible for accomplishing, and the structure by which the agency performs its mandated tasks, all of which are specified in an agency's authorizing legislation, must be examined as a whole in order to discern the legislature's intent with regard to rulemaking."

*Trebesch*, 300 Or at 269-70. *Trebesch* held, in short, that whether an agency is required to take action through rulemaking as opposed to another path is a function of how the legislature intended for *that* agency to perform the task in question, as reflected in the agency's enabling statutes.

We applied the *Trebesch* analysis three years later in *Forelaws on Board v. Energy Fac. Siting Council*, 306 Or 205, 760 P2d 212 (1988). That case presented the question whether the Energy Facility Siting Council (EFSC) had lawfully determined that a company's industrial waste was not "radioactive waste" under ORS 469.300(17). *Id.* at 207. By rule, EFSC had defined "thresholds of radioactivity that pose hazards to public health," and the legislature had incorporated those standards into the statutory definition

of "radioactive waste." *Id.* at 215. At issue in *Forelaws* was EFSC's application of those statutory standards to "evaluations of radon-222 concentrations." *Id.* at 213. EFSC had announced that application in "interpretive rulings," and the petitioners argued that EFSC was required to have done so through formal notice-and-comment rulemaking. *Id.* We explained that "EFSC's interpretations of [the standard] are within the APA's definition of 'rule,' and EFSC *could* have made these interpretations in rulemaking proceedings under the APA." *Id.* at 213-14. We also observed that, under ORS 183.355(6),

> "an agency may sometimes, in the course of deciding a contested case, state propositions that it also could adopt in rulemaking proceedings. If an agency is required to adopt a rule through rulemaking proceedings, that requirement must be found through an analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt."

*Id.* at 214 (citing *Trebesch*, 300 Or at 267). We ultimately concluded in *Forelaws* that, although EFSC's enabling statutes gave the agency "broad authority to set policies," which suggested a legislative intent to require rulemaking, the particular issue in *Forelaws* involved a narrower question on which the legislature had already made a complete policy choice, with EFSC's role being limited to interpretation. *Id.* at 215-16.

In sum, "[w]hether an agency is required to adopt a policy that qualifies as a 'rule' *solely* by means of rulemaking procedures depends on whether the legislature has declared that rulemaking is the sole acceptable means of adopting the particular policy at issue." *Homestyle Direct*, 354 Or at 266 (emphasis in original). That determination, in turn, requires "analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt." *Forelaws*, 306 Or at 214.

Importantly, the APA itself, including its definition of "rule," is of no help in resolving whether the agency must engage in rulemaking as a predicate for enforcement and adjudication. As to that question,

"[t]he answer is not found in the constitution, * * * or in a common law, that is, a judge-made common law of administrative agencies; nor may it be divined from the state administrative procedures act, * * * which does no more than set uniform procedures for state agencies. Rather, the answer is a matter of statutory interpretation, the relevant statutes being those regulating the particular agency whose action is challenged. We seek to derive the legislature's intent from an analysis of the statutes by which a particular agency operates. The authorizing statutes will specify whether rulemaking or adjudication authority, or both, are delegated to the agency and will indicate the agency's tasks, the breadth of the agency's discretion to carry out these tasks, and the process by which they are to be accomplished."

*Trebesch*, 300 Or at 267.

The foregoing cases also instruct that, in determining the legislature's intent as to whether rulemaking is required, the nature of the statutory terms being applied is especially important, though not dispositive. Where a statutory term is delegative and the agency has broad rulemaking authority, that has supported a conclusion that the legislature intended for the agency to engage in rulemaking. *Forelaws*, 306 Or at 214. Where an agency's rulemaking authority is more circumscribed or where a statutory term calls only for interpretation and application, that has supported a conclusion that rulemaking was not required, absent some contrary indication of the legislature's intent. *Coffey v. Board of Geologist Examiners*, 348 Or 494, 502-03, 235 P3d 678 (2010).

We have referred to statutory terms calling for interpretation and application as either "exact" or "inexact" terms, both of which charge an agency with carrying out the legislature's complete expression of policy, as compared to "delegative terms," which "delegate" some level of policymaking authority to an agency. *Springfield Education Assn. v. School Dist.*, 290 Or 217, 224-26, 228, 621 P2d 547 (1980). Exact terms "impart relatively precise meaning" and involve agency factfinding. *See id.* at 223-24 (giving examples of exact terms as "21 years of age, male, 30 days, Class II farmland, rodent, Marion County"). "Inexact

terms," on the other hand, are still a "complete" expression of policy, but are less precise. *Id.* at 224. An inexact term often requires an agency to determine what the legislature intended by the term, and that determination is a question of law. *Id.* In *Coffey*, we explained that *Megdal*'s requirement for rulemaking prior to adjudication had been applied to an incomplete legislative policy, whereas *Coffey* presented an expression of "complete" legislative policy. *Coffey*, 348 Or at 502-03. That complete legislative policy was expressed as a list of four sanctions, graduated in severity. Because imposing one sanction from a menu of sanctions was more analogous to interpreting and applying law than to making new law, no prior rulemaking was required. *Id.* at 503.

Those cases demonstrate that, when this court has determined that the legislature intended for an agency to engage in rulemaking before adjudication, an important factor has been our conclusion that the statute required the agency to formulate policy to fill in an incomplete expression by the legislature. By the same token, when a statute reflects a complete policy statement by the legislature, such that the agency's function has been merely interpretive, that has been a reason to conclude that the agency could state its interpretation during enforcement and adjudication without first promulgating a rule.

E.   *Summary*

With the foregoing principles in mind, we return to the reasoning by which petitioners argue, and the Court of Appeals concluded, that DEQ adopted a rule. As noted above, petitioners do not identify any specific statement or communication by DEQ as the "rule" but contend, instead, that the rule consists of DEQ's internal "decision" to adopt a new interpretation of the auto-dismantler exception—a decision that reflects a "discretionary choice" that DEQ made for "policy" reasons. Necessarily, therefore, petitioners distinguish DEQ's decision from an adoption of policy that an agency may permissibly make in a contested case proceeding under ORS 183.355(6). Similarly, although it did not address ORS 183.355(6), the Court of Appeals relied on its own case law to conclude that DEQ's new interpretation of the auto-dismantler exception demonstrated that multiple

interpretations were "reasonable"; and, because the agency's new interpretation was not "necessarily required" by the statute itself, it was therefore a "policy-based decision" and a "new exercise of agency discretion" that could only occur through rulemaking. *PNW Metal Recycling, Inc.*, 317 Or App at 212-13.

Those analyses flow from premises that are flawed. First, the focus on the fact that DEQ adopted different interpretations at different times, and on DEQ's reason for making the change, is misplaced. Petitioners assume from the fact that DEQ desired a change in policy that the statute *authorized* DEQ to make a discretionary policy choice and that DEQ had to effectuate that choice in a particular manner—but neither assumption is necessarily correct. That the text of a statute is amenable to multiple interpretations does not mean that an agency has been delegated the authority to choose among them. Whether that is so depends on whether the statutory wording is inexact or delegative. A statute with inexact terms may be subject to alternative plausible interpretations, but the meaning of those terms is still a question of law, not agency prerogative. *Springfield Education Assn.*, 290 Or at 224.

Relatedly, the fact that DEQ interpreted the auto-dismantler exception differently before and after 2018 does not establish that the statute confers "discretion" on the agency to make a policy choice. Delegative and inexact terms both require further interpretive work by an agency, but only the former entail policymaking. *Coffey*, 348 Or at 502-03, 508. Thus, although it is true that DEQ adopted different interpretations of the auto-dismantler exception at different times, it does not follow that the statute confers discretion on DEQ to make a policy decision. If the statute contains inexact rather than delegative terms—a question not addressed by the parties and which we do not resolve today—then DEQ's revised interpretation is either correct or incorrect as a matter of law. And that is so regardless of whether DEQ had "policy-based" or "regulatory" motives for revising its interpretation. If a reviewing court were to conclude that the auto-dismantler exception reflects a complete expression of legislative policy, then DEQ's current

interpretation would stand or fall on its merits; neither DEQ's reason for adopting it, nor the fact that DEQ previously interpreted it differently, would be of any moment.

In addition, even assuming that DEQ's new interpretation of the auto-dismantler exception is fairly characterized as an exercise of delegated policymaking rather than interpretation of an inexact statutory term—a question that, we reiterate, has not been developed and is not squarely presented here—the legislature did not intend for rulemaking to be the path for every adoption of policy by an agency. A conclusion that rulemaking is required must be based on detailed analysis of the substantive statutory scheme; the APA does not provide an answer. *Trebesch*, 300 Or at 267. Petitioners have not developed an argument—rather, they appear to have assumed—that the statutes addressing solid waste disposal reflect a legislative intent that the interpretation and application of the auto-dismantler exception must occur through rulemaking rather than through a contested case as allowed by ORS 183.355(6). That question is critical, however: If the legislature did *not* intend to require rulemaking on that issue, then, under our case law, the agency is permitted to make its decision through the contested case process. Although we need not resolve that question now, we observe that the parties' apparent agreement that DEQ lacks rulemaking authority in this area would seem to cut against a conclusion that the legislature intended to require rulemaking as a prerequisite for interpreting the auto-dismantler exception.[4]

F.  *Petitioners Have Not Identified a "Rule" Subject to Review Under ORS 183.400*

In sum, if DEQ's decision to reinterpret the auto-dismantler exception constitutes a rule, it is not for all the reasons petitioners have argued. Neither the fact that DEQ has adopted different interpretations nor DEQ's reason for making the change bears on whether rulemaking

_____

[4] Petitioners might argue that the statutory scheme contemplates that the required rulemaking be done by EQC, the entity that provides policy direction to DEQ. That may be true; on the other hand, the solid waste disposal statutes specifically direct DEQ to take certain actions regarding the issuance of permits, and it is not clear that those directives are conditioned on whether any rules have been promulgated by EQC. In any event, we need not resolve that issue here.

was required or whether DEQ's action here was a rule. To the extent that petitioners contend that a rule challenge under ORS 183.400 *must* be available to review an agency's policy choice, that view is mistaken for the reasons we have explained; review of an order in a contested case is another mechanism. Stripped of those considerations, petitioners' argument reduces to the proposition that DEQ's *interpretive choice* itself is a "rule" as defined by ORS 183.310, such that it may be challenged in a proceeding under ORS 183.400. For several reasons, that proposition is wrong.

Once again, ORS 183.310(9) states that, subject to exceptions, a rule is "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency[.]" Several exceptions are of note here. First, ORS 183.310(9)(d) exempts "[i]ntra-agency memoranda." Second, ORS 183.310(9)(a) exempts "internal management directives, regulations or statements which do not substantially affect the interests of the public." Third, ORS 183.310(9)(c) exempts "[d]eclaratory rulings issued pursuant to ORS 183.410[.]" ORS 183.410 provides that, "[o]n petition of any interested person, any agency may in its discretion issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it." Such rulings are reviewable by the Court of Appeals in the same manner as orders in contested cases. *Id.*

With those exceptions in mind, along with the other principles discussed above, we conclude that petitioners have not identified a rule. As explained earlier in our discussion of the text of ORS 183.310(9), an agency's interpretive *decision*, standing alone, is an awkward fit with the definition's reference to a "directive, standard, regulation or statement." Moreover, DEQ has yet to take any action that is "generally applicable" in the sense meant by ORS 183.310(9). Arguably, DEQ's interpretive choice can be thought of as generally applicable in the sense that DEQ has an apparent intention to apply it to petitioners and similarly situated entities in the scrap-metal recycling industry. But in light of the APA as a whole, "applicable" in this context must require something

more than an agency's prospective intent. *See Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002) (defining "application" as "employment as a means: specific use"). If DEQ had done nothing more than circulate an internal agency memo announcing a revised interpretation of the auto-dismantler exception, that memo would be generally applicable in the same sense that petitioners urge here, but it would not be a "rule," because intra-agency memoranda are specifically excluded from the definition. Deeming the "decision" itself to be the rule in that situation would undermine the point of the exception that allows the agency to announce its decision internally. Moreover, it would be peculiar if the interpretive choice reflected in the memo constituted a rule while the expression of that choice in the memo did not. By referring to statements, directives, regulations, or standards of "general applicability" and excluding intra-agency memoranda and "internal management directives, regulations or statements which do not substantially affect the interests of the public," the definition of "rule" contemplates an *expression* of an agency decision that has "general applicability" in the sense that it is made operative—*i.e.*, the agency somehow has communicated the decision in a way that purports to bind those subject to it.

In addition, if petitioners' view was correct, that would frustrate the provisions of the APA making clear that an agency may use the contested case process to interpret statutes and adopt policy. An agency's use of ORS 183.355(6) as the means to state an interpretive choice will, presumably, be preceded by the choice itself. On that point, petitioners advance a curious argument. They acknowledge that ORS 183.355(6) allows an agency to interpret a statute in a contested case proceeding, but they argue that, if the decision to adopt that interpretation *precedes* the contested case proceeding and is made "for policy or regulatory reasons," then the action requires rulemaking.

That distinction is untenable. Petitioners seem to suggest that the APA allows agencies to interpret a statute or announce policy through the contested case process only so long as the agency does so without forethought, and without a "policy or regulatory" purpose. That is not a realistic

account of how agencies operate. The APA requires agencies to give notice to affected parties before beginning a contested case, ORS 183.413, and we presume that, in the ordinary course, agencies will decide what a statute means before they prosecute violations of it. Petitioners' argument that such a decision requires rulemaking would nullify the provisions of the APA that allow agencies to use the contested case process for "adoption of a general policy applicable to the case and subsequent cases of like nature." ORS 183.355(6).

Finally, petitioners' argument that an interpretive choice is a "rule" is difficult to square with a provision they do not address—ORS 183.310(9)(c), which exempts "declaratory rulings" from the definition of rule. ORS 183.410, as noted earlier, allows an interested person to request an agency's ruling "with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it." Such a ruling is subject to judicial review—but, significantly, in the manner afforded to final orders in *contested cases*. ORS 183.410. Just as with ORS 183.355(6), therefore, an agency's declaration about a statute's applicability is not necessarily reviewable as a rule. That is further evidence that the agency's internal decision about how to interpret the statute—which will necessarily precede any declaratory ruling under ORS 183.410—is not a rule, either.

For the foregoing reasons, we conclude that an agency's interpretive decision is not, itself, a rule, although the generally applicable expression of such a decision could be.[5] Here, however, DEQ did not communicate its decision to anyone but petitioners. DEQ's revised interpretation of the auto-dismantler exception and its stated intention to require petitioners to obtain a permit are, at this point, precursors to DEQ's initiation of an enforcement action that may lead to a contested case proceeding.

Judicial review of a final order in a contested case would present an opportunity for petitioners, should they

---

[5] Petitioners correctly point out that the Oregon APA differs from the federal Administrative Procedures Act in that regard. The federal APA specifically exempts "interpretative rules" from rulemaking requirements. 5 USC § 553(b); *Perez v. Mortgage Bankers Ass'n*, 575 US 92, 96-97, 135 S Ct 1199, 191 L Ed 2d 186 (2015). The Oregon APA contains no such exemption; on the contrary, the definition of "rule" encompasses statements that "interpret" law. ORS 183.310(9).

wish, to argue that DEQ's revised interpretation of ORS 459.005(8)(b)(D) is incorrect as a matter of law. Alternatively, petitioners may seek to demonstrate, under the *Trebesch* line of cases, that the solid waste disposal statutes reflect a legislative intent that the agency "promulgate rules in advance of adjudication," 300 Or at 267, *i.e.*, that rulemaking is the required path for adopting an interpretation of the auto-dismantler exception. As yet another alternative, petitioners may choose to avail themselves of ORS 183.410, which enables them to request a "declaratory ruling" from DEQ as to the applicability of the auto-dismantler exception. Such a ruling would be reviewable in the manner of a final order in a contested case.

For the foregoing reasons, petitioners have failed to identify a "rule" subject to challenge under ORS 183.400. Accordingly, we vacate the Court of Appeals' decision and dismiss the judicial review.

The decision of the Court of Appeals is vacated. The judicial review is dismissed.